## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PROGRESSIVE WASTE SOLUTIONS OF LA, INC.** | **CIVIL ACTION** |
| **V.** | **NO. 16-8669** |
| **ST. BERNARD PARISH GOVERNMENT** | **SECTION "L" (5)** |

### ORDER & REASONS

The parties in this action have collectively filed six motions for summary judgment. R. 38, 39, 46, 48, 54, 57. Plaintiff PWS has filed a Motion for Partial Summary Judgment Declaring its 2013 Time Contract with St. Bernard Valid and a Motion for Summary Judgment Declaring Intervenor's Contract Invalid. R. 46, 48. Defendant St. Bernard has filed a Motion for Summary Judgment Declaring the Pelican Contract Valid and a Motion for Summary Judgment Declaring the PWS Contract Invalid. R. 54, 57. Intervenor Pelican has filed a Motion for Summary Judgment Finding Plaintiff's Contract Invalid and a Motion for Summary Judgment on the Validity of Pelican's Contract and the Right of St. Bernard Parish Government to Pay it. R. 38, 39. PWS also brings a Motion to Dismiss for Failure to State a Claim in Counterclaim, R. 63, a Motion for Summary Judgment on Counterclaim, R. 65, and a Motion to Strike Certain of Defendant's Witnesses. After reviewing the briefs, the applicable law, and counsels' statements at oral argument, the Court now issues this Order & Reasons.

### I.    BACKGROUND

This case arises out of a contract dispute. Plaintiff Progressive Waste Solutions of LA, Inc. ("PWS") is a Delaware corporation that specializes in solid waste removal. R. 1 at 1–2. In early 2006, St. Bernard Parish Government ("St. Bernard") through its Department of Public Works issued a Request for Proposals for Municipal Solid Waste Removal, Curb Side Pick Up.

1

R. 1 at 2.  SDT Waste & Debris Services, LLC, ("SDT") submitted a proposal, and on July 27, 2016, contractually agreed to provide solid waste removal services to St. Bernard.  R. 1 at 2.  On February 7, 2007, SDT entered into a Time Contract with St. Bernard regarding both curb side pick-up services and dumpster pick-up services.  The Time Contract was set to commence on January 28, 2008, and terminate on January 27, 2014.  R. 1 at 3.  The Time Contract also provided SDT the option to extend the agreement through July 26, 2016.  R. 1 at 3.

In May of 2011, SDT was purchased by IESI LA Corporation, which included the transfer and assignment of the July 27, 2006 Agreement and the February 7, 2007 Time Contract. Despite the purported term of the Time Contract extending to at least January 27, 2014, St. Bernard signaled that it intended to terminate the contractual relationship.  On December 5, 2011, St. Bernard sought bids for curb side pick-up services and dumpster pick-up services.  R. 1 at 3–4.  On December 8, 2011, IESI filed a Petition for Temporary Restraining Order, Preliminary and Permanent Injunction, and Declaratory Judgment in the Thirty-Fourth Judicial District Court for the Parish of St. Bernard.  R. 1 at 4.  The state court issued the preliminary injunction on December 14, 2011, and enjoined St. Bernard from requesting proposals for bids for solid waste collection.  R. 1 at 4.  One week later, the state court enjoined St. Bernard from entering into any new contract for the services currently being performed by IESI.  R. 1 at 4.

IESI changed its name to Progressive Waste Solutions of LA, Inc. ("PWS") on January 12, 2012.  In May of 2013, St. Bernard once again issued Requests for Proposals inviting vendors to submit proposals for the waste collection services provided by PWS.  R. 1 at 4.  In response, PWS filed a Motion for Contempt and a Second Supplemental and Amending Petition for Temporary Restraining Order, Preliminary and Permanent Injunction and Declaratory Judgment in state court on May 20, 2013.  R. 1 at 4–5.  The parties resolved their differences before the state court could rule, with St. Bernard agreeing to extend the Time Contract through

2

December 31, 2020, in exchange for PWS reducing its rates from $20,00 per household per month to $15.50 per household.  R. 1 at 5.  Two months later, PWS and St. Bernard entered into a new Time Contract that extended PWS's provision of solid waste services until December 31, 2020.

On May 19, 2016, St. Bernard wrote to PWS stating that they intended to unilaterally terminate the solid waste services contract on July 6, 2016.  St. Bernard provided two reasons for the termination: (1) the St. Bernard Home Rule Charter prohibits contracts for services not covered by public bid law exceeding three years; and (2) PWS breached the contract by missing residential pickups.  R. 1 at 6; *see also* R. 1–7.  PWS brings the instant suit in response, and has amended its Complaint to request damages and declaratory relief.  R. 33 at 11–15.

Pelican Waste and Debris, LLC ("Pelican"), filed a Motion for Leave to File Intervention on June 16, 2016.  R. 11.  The Court granted the Order, finding that Pelican had an interest in the instant litigation.  R. 18.  Specifically, Pelican alleges that it was hired by St. Bernard to replace PWS as the provider of residential waste removal services in St. Bernard Parish, and that its interests will be frustrated and it will be prejudiced if PWS receives its requested relief.  R. 11-2.

The Court denied PWS's Motion for Preliminary Injunction on Friday, June 24, 2016.  R. 24.  The Court found that PWS failed to prove irreparable injury, a substantial likelihood of success of the merits, and that the balance of injuries weighed in its favor.  R. 24.

## II.   PRESENT MOTIONS

PWS, St. Bernard, and Pelican each move for partial summary judgment on two separate issues: (1) whether St. Bernard's contract with PWS is valid; and (2) whether St. Bernard's contract with Pelican is valid.  R. 38, 39, 46, 48, 54, 57.  PWS also brings a Motion to Dismiss for Failure to State a Claim in Counterclaim, R. 63, a Motion for Summary Judgment on

Counterclaim, R. 65, and a Motion to Strike Certain of Defendant's Witnesses.  The Court will discuss these motions in turn.

### A.      Motions Regarding the Validity of PWS's Contract

PWS takes the position that its contract with St. Bernard is valid, and denies that it may be voided due the contract's alleged noncompliance with the St. Bernard Charter.  R. 46-1 at 7–8.  Specifically, PWS finds inapplicable the Charter's prohibition on contracts for services not covered by the public bid law that exceed three years.  Section 5-06 of the St Bernard Charter provides as follows:

> (b) Nothing in this Charter shall be construed so as to prevent the making or authorizing of payments or making of contracts for capital improvements to be financed wholly or partly by the issuance of bonds or to prevent the making of any contract or lease, provided that such action is authorized by ordinance. **Contracts for services not covered by the public bid law shall not be for a period exceeding three (3) years.**

R. 46-1 at 8 (emphasis added).

PWS advances four arguments that this language does not void the contract: (1) the Charter's three-year cap is only applicable to contracts for capital improvements; (2) state law authorizing ten-year "time contracts" for the collection of garbage or trash supplants the Charter's three-year cap; (3) St. Bernard opted in to state law that classifies the contract within the scope of public bid law; and (4) the contract is a legal "compromise" which may only be rescinded for error, fraud, and other grounds for the annulment of contracts.  R. 46-1 at 7–19.

St. Bernard disagrees.  According to St. Bernard, St. Bernard rightfully terminated the PWS contract on the grounds that the contract violates the St. Bernard Charter's prohibition on service contracts not covered by public bid law in excess of three years.  R. 57-1 at 4.  In the alternative, St. Bernard contends that the PWS contract was impliedly an exclusive franchise because PWS was the exclusive provider of municipal waste removal services for several years.

R. 57-1 at 6–16.  Exclusive franchises must be awarded pursuant to public bid law, and St. Bernard asserts that its ten-year contract with PWS did not comport with public bid law.  R. 57-1 at 16–17.  St. Bernard therefore concludes that the PWS contract is null.

Pelican also argues that PWS's contract fails.  Pelican challenges PWS's assertion that the contract is a "time contract," on the grounds that the contract calls for payment based on price per residence and not according to the time worked by PWS.  R. 38-2 at 7–8.  Pelican argues that the contract is therefore subject to the three-year term limit on contracts for services, and that the contract expired on January 1, 2016.  R. 38-2 at 11-12.  Pelican also notes that the contract as written allows PWS twelve years of municipal waste services, which exceeds the ten-year restriction on time contracts allowed by state law.  R. 38-2 at 10–11.

**B.**  **Motions Regarding the Validity of Pelican's Contract**

Pelican asserts that its contract with St. Bernard does not violate public bid law, parish law, or any Louisiana statute, and is therefore valid.  R. 39-2 at 7–8.  According to Pelican, public bid law only applies to exclusive contracts for waste services.  R. 39-2 at 8.  Pelican asserts that its contract was not exclusive on its terms.  R. 39-2 at 8–9.  The Pelican contract explicitly characterizes itself as non-exclusive, and provides that both St. Bernard and Pelican are respectively free to provide services to other clients or engage the services of other contractors.  R. 39-4 at 19.  Pelican also avers that La. R. S. § 39:1503's order that contracts for waste collection services be advertised is inapplicable, because the statute was repealed effective January 1, 2015.  R. 39-2 at 10.  Lastly, Pelican argues that St. Bernard's departmental guidelines cannot nullify the contract.  Pelican asserts that the guidelines lack the force and effect of law, that the guidelines only apply to public works projects, and that the guidelines are inapplicable to a non-exclusive contract such as Pelican's.  R. 39-2 at 10–14.

Pelican also argues that Progressive standing to object to the validity of its contract with St. Bernard.  Pelican avers that PWS has no interest or relationship with Pelican's contract, because the validity of Pelican's contract is unrelated to the purported breach of contract between PWS and St. Bernard.

PWS takes the position that St. Bernard's departmental guidelines clearly prohibit professional services contracts that are not initiated with a Request for Proposals.  R. 48-1 at 3–7.  PWS notes that St. Bernard's Charter and ordinances require public servants to follow administrative requirements and guidelines.  R. 48-1 at 9.  PWS contends that the guidelines therefore carry the force of law, and that St. Bernard's decision to forego Requests for Proposals invalidates the contract.  R. 48-1 at 9–10.  As to Pelican's standing argument, PWS cites case law suggesting that a waste services provider may have taxpayer standing to challenge a municipality's newly-issued contract to a competitor.  R. 48-1 at 10–11.

St. Bernard agrees with Pelican that the Pelican contract should be considered valid.  St. Bernard contends that the departmental guidelines cannot be legally controlling because the guidelines were a mere draft proposal on May 23, 2016, the date that the Pelican contract was adopted.  R. 54-1 at 4.  With this in mind, St. Bernard argues that the St. Bernard Charter's command that public servants shall follow administrative regulations is inapplicable to the draft guidelines.  Therefore St. Bernard's violation of the draft guidelines arguably cannot void the contract.  R. 54-1 at 5.

### C.   PWS's Motion for Summary Judgment on Counterclaim

PWS moves for summary judgment on St. Bernard's counterclaims.  R. 65-1.  St. Bernard asserts five counterclaims: (1) breach of contract for overbilling for the quantity of services performed between August 1, 2006, and December 31, 2012; (2) breach of contract for overbilling in pricing for services performed between January 20, 2014 and December 31, 2014;

6

(3) breach of the 2013 PWS contract for failure to perform; (4) declaratory relief that the first SDT contract, the Second SDT contract, and the PWS contract were awarded in violation of Louisiana's public bid law; and (5) declaratory relief that the second SDT contract and the PWS contract violated section 5-06 of the St. Bernard Charter.  PWS asserts in response that: (1) there is no genuine issue of material fact precluding a finding that PWS or its predecessors in interest did not breach any contract with St. Bernard; (2) that no genuine issue of material fact precludes a finding that St. Bernard cannot carry its burden of proof that it suffered any damages as a result of the breach; and (3) that the 2006 SDT contract, the 2007 SDT contract, and the 2013 Time Contract are enforceable.

Beginning with St. Bernard's first counterclaim for overbilling under the 2006 and 2007 SDT contracts, PWS avers that St. Bernard and SDT routinely bickered regarding the meaning of "units" under the SDT contracts.  SDT was to be paid $20.00 per "unit" per month, but the contract did not define the term "unit."  R. 65-1 at 13.  PWS maintains that St. Bernard cannot provide any evidence that breaches occurred as a result of these overbillings subject to an ambiguous term in the 2006 and 2007 SDT contracts.  R. 65-1 at 13–14.  PWS further asserts that any disagreement as to the meaning of "unit" was ratified in favor of SDT, because St. Bernard routinely made payments for the work performed by SDT.  R. 65-1 at 14.

PWS also claims that St. Bernard's second counterclaim for overbillings on the 2013 contract does not raise a question of material fact.  According to PWS, PWS hand delivered a letter on January 20, 2014, in which PWS requested a rate increase per residential unit that was linked to the Consumer Price Index.  PWS maintains that Dave Perralta, St. Bernard's former parish president, took receipt of the letter and agreed that the rate would be increased from $15.50 to $15.73 per residential unit.  R. 65-1 at 15.  PWS contends that Dave Perralta once again approved a rate increase from $15.73 per residential unit to $15.85 per residential unit on

January 21, 2015.  With the preceding in mind, PWS asserts that St. Bernard presents no evidence that the rate increases were not duly authorized by St. Bernard.  PWS also argues in the alternative that St. Bernard cannot prove damages, because St. Bernard did not pay PWS the increased rates.  PWS asserts that St. Bernard has a past due balance of $1,365,255.94 with PWS.

PWS next argues that St. Bernard cannot prove a breach of the 2013 PWS contract for failure to perform.  R. 65-1 at 17.  PWS avers that St. Bernard has only presented evidence of ninety customer complaints since the inception of the 2013 PWS contract, and that this is insufficient to show a breach.  Further, PWS also contends that St. Bernard has submitted no evidence that it hired someone to remedy PWS's alleged breaches, and that this is fatal to St. Bernard's burden regarding proof of damages.  R. 65-1 at 18.

Regarding the validity of the 2006 SDT contract, the 2007 SDT contract, and the 2013 PWS contract, PWS asserts that St. Bernard is estopped from arguing that these contracts are invalid.  First, PWS argues that St. Bernard played an instrumental part in the drafting of these contracts, and that St. Bernard has therefore forfeited its right to attack the contract's validity.  R. 65-1 at 18–19.  PWS also avers as a matter of law that none of these contracts are "exclusive franchises" under Louisiana public bid law, so none of the contracts were issued in violation of the public bid law.  R. 65-1 at 19.

As to St. Bernard's fifth counterclaim for declaratory relief that the contracts are invalid under the terms of St. Bernard's Charter, PWS refers the Court to PWS's Motion for Partial Summary Judgment Regarding the 2013 Time Contract.  R. 65-1 at 20.

In response, St. Bernard points to evidence which St. Bernard contends creates questions of material fact.  For instance, regarding Count 1, "Breach of Contract for Overbilling for the Quantity of Services Performed," St. Bernard cites the residential water meter count, the tonnage of residential waste, the quantity of commercial services performed, invoices submitted by PWS,

8

a graph visually depicting the foregoing data, and the deposition of Craig Taffaro.  R. 82 at 34.

PWS then asserts that "[t]he evidence submitted by SBPG reflects that PWS/SDT billed SBPG

for more drastically more [sic] households than could have existed at the relevant time periods."

R. 82 at 34.  This analysis is typical of St. Bernard's Opposition.  *See* R. 82 at 34–35.

### A.      PWS's Motion to Dismiss

PWS moves pursuant to Rule 12(b)(6) to dismiss all of St. Bernard's counterclaims for

wrongs allegedly committed prior to 2013, on the grounds that such claims are barred by the

doctrine of claim preclusion, a subset of *res judicata*.  R. 63-1.  According to PWS, PWS filed a

claim against St. Bernard in 2013 in regards to PWS's rights under the 2007 SDT waste services

contract between SDT and St. Bernard.  R. 63.  Specifically, PWS characterizes the 2013 action

as a breach of contract action, which asserts that St. Bernard wrongly attempted to solicit

proposals for services provided by PWS before the expiration of the term of the Time Contract.

R. 63-1 at 8.

St. Bernard Parish opposes the motion, arguing that PWS's claim preclusion argument

calls into question three of St. Bernard's counterclaims: (1) St. Bernard's claim for damages

resulting from PWS's improper disposal and attribution of non-residential waste and non-St.

Bernard waste to St. Bernard's account with River Birch; (2) St. Bernard's claim for damages

resulting from improper payments for profit under an invalidly awarded contract prior to January

1, 2013; and (3) SBPG's claim for damages resulting from PWS's overcharging for the number

of units serviced under the Second SDT contract.  St. Bernard argues that the Court must look to

the nucleus of operative facts, rather than the substantive theories advanced, in order to

determine whether the preceding categories of claims are subject to claim preclusion.

St. Bernard describes each claim in an attempt to distinguish its operative facts from the

2013 suit filed by PWS against St. Bernard.  St. Bernard takes the position that two of the

counterclaims arise from the bad acts of SDT, such as overbilling for housing units or for the collection of waste outside the scope of the SDT contract.  R. 82 at 11–12.  St. Bernard also avers that its current claim to nullify the contract as being noncompliant with the public bid law is based on equitable theories of quantum meruit.  R. 82 at 12–13.  St. Bernard contrasts the facts underlying these theories with the facts supporting PWS's 2013 argument that St. Bernard was not entitled to issue Requests for Proposals in 2011 and 2013.  R. 82 at 13.

## III.   DISCUSSION OF THE MOTIONS ON THE VALIDITY OF THE CONTRACTS

The parties move for summary judgment on the validity of two contracts, thereby touching on the interpretation of state and local laws.  The Court shall therefore review the law of contractual and statutory interpretation before turning to its analysis of the facts.

### A.     Applicable Law

#### i.     Summary Judgment Standard

Summary judgment is appropriate when the record before a court supports the conclusion that there is no "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact.  *See id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996).  "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment.  *See Hopper v. Frank*, 16 F.3d 92, 97 (5th

Cir. 1994); *see also Anderson*, 477 U.S. at 249–50.  In ruling on a summary judgment motion, however, a court may not resolve credibility issues or weigh evidence.  *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).  Furthermore, a court must assess the evidence and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment.  *See Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001).

           ii.        Principles of Louisiana Statutory and Contractual Interpretation

A federal court sitting in diversity applies state substantive law, including the state's choice of law rules and methods of statutory interpretation.  *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Keenan v. Donaldson, Lufkin & Jenrette, Inc.,* 529 F.3d 569, 572–73 (5th Cir. 2008).  "To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court."  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir.2007) (internal citations omitted).  "In the absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case."  *Id.*

In the absence of precedent to guide the interpretation of a statute, Louisiana courts look to the plain meaning of the text of the statute in accordance with Article 9 of the Louisiana Civil Code, which states that "[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code art. 9.  In contrast, when a law is susceptible of different meanings, the Code provides that "[w]hen the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law."  La. Civ. Code art. 10.

Federal courts also follow state-law principles of contractual interpretation.  In *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, the Supreme Court of Louisiana explained the law applicable to contract interpretation:

> Contracts have the effect of law for the parties and the interpretation of a contract is the determination of the common intent of the parties. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed.  When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract.  Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties.  However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Most importantly, a contract must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance. Moreover, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

2012-2055, p. 5-6 (La. 3/19/13); 112 So.3d 187, 192 (citations and quotations omitted).

However, if the "written expression of the common intention of the parties is ambiguous," parol or extrinsic evidence is admissible to interpret the contract.  *Campbell v. Melton*, 2001-2578, p. 6 (La. 5/14/02); 817 So.2d 69, 75 (citing *Ortego v. State, Through the Dep't of Transp. & Dev*., 96-1322 (La. 2/25/97); 689 So.2d 1358).  "A contract is considered ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or

ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed." *Id.* (citations omitted).

### B.     Pertinent State Law and Parish Law

The facts at issue raise questions under Louisiana state and parish laws.  The Court shall briefly review these texts before proceeding to analysis.

The Court begins with Louisiana Revised Statute 33:4169.1(A)(3).  This law provides that "[t]he governing authority of every parish and municipality shall have the following powers: . . . To enter into time contracts for the collection and transportation of garbage or trash for a term of up to ten years, and for disposal of garbage or trash for a term of up to twenty-five years."  La. R. S. 33:4169.1(A)(3).  No positive state law defines the term "time contract," but the Louisiana Attorney General has opined that municipal non-franchise contracts for the collection, transportation, and disposal of solid waste are "time contracts" under the provisions of Louisiana Revised Statute 33:4169.1(A)(3).  La. Att'y Gen. Op. No. 94-108 (Mar. 22, 1994). The Attorney General's opinion also advises that contracts for the collection, transportation, and disposal of solid waste are either exclusive franchises, non-exclusive franchises, or time contracts pursuant to La. R. S. 33:4169.1(A)(2) or La. R. S. 33:4169.1(A)(3).  *Id.*

Louisiana Revised Statute 39:1503 is also pertinent to the instant action despite the fact that it was repealed effective January 1, 2016.  The law stated:

> For consulting service contracts with a total maximum compensation of fifty thousand dollars or more, except for such contracts entered into by the Department of Transportation and Development, adequate public notice of the request for proposals shall be given by advertising in the official journal of the state and in one or more newspapers of general circulation in the state at least once.  The advertisement shall appear at least thirty days before the last day that proposals will be accepted.  When available, advertisements shall be placed in those national trade journals which serve the particular type of contractor desired.  In addition, written notice shall be provided to persons, firms, or

13

> corporations who are known to be in a position to furnish such
> services, at least thirty days before the last day that proposals will
> be accepted.

La. R. S. 39:1503.  Title 39 was not mandatory for parish governments when the PWS contract

was finalized in 2013.  R. 46-1 at 15.

St. Bernard's Charter and local ordinances are also at issue.  Section 5-06, entitled

Administration of Operating and Capital Budgets, provides that

> (a) No payment shall be made or obligation incurred
> against any allotment or appropriation except in accordance with
> the approved operating and capital budgets and appropriations duly
> made, and unless the president or the president's designee first
> certified that there is a sufficient unencumbered balance in such
> allotment or appropriation and that sufficient funds therefrom are
> or will be available to cover the claim or meet the obligation when
> it becomes due and payable. This provision shall not limit the
> authority to borrow funds in anticipation of revenues as provided
> in the general laws of the state. Any authorization of payment or
> incurring of obligation in violation of the provisions of this Charter
> shall be void, and any payment so made illegal. Any such violation
> shall be cause for removal of any official, officer, or employee
> who knowingly authorized or made such payment or incurred such
> obligation or who caused such payment to be authorized or caused
> such obligation to be incurred. Such person shall also be personally
> financially liable to the parish government for any amount so paid.
>
> (b) Nothing in this Charter shall be construed so as to
> prevent the making or authorizing of payments or making of
> contracts for capital improvements to be financed wholly or partly
> by the issuance of bonds or to prevent the making of any contract
> or lease, provided that such action is authorized by ordinance.
> **Contracts for services not covered by the public bid law shall
> not be for a period exceeding three (3) years.**
>
> (c)  Deficit spending is prohibited except for emergencies as
> provided in section 5-04(b).

R. 46-1 at 8 (emphasis added).  The Charter also provides for a director of finance, whose office

is responsible for the "[p]rocurement of all . . . services required by the parish government under

a  central  purchasing  system  for  all  departments,  offices,  and  agencies  in  accordance  with

applicable state law, council policy, and administrative requirements."   R. 57-9 at 21–22.

"Administrative requirements" is not defined in the Charter, nor in any St. Bernard ordinance.

The director of public works is the only officer given explicit authority over waste removal by

the Charter.   The Charter provides that "[t]he director of public works shall direct and be

responsible for . . . [g]arbage and trash collection and disposal."  R. 57-9 at 23.

The parties cite one ordinance enacted by St. Bernard.  In Parish ordinance 13-49, the

Parish authorized the collection of a local tax, which provided that:

> The proceeds of the tax are to be dedicated and used for acquiring,
> constructing, improving, maintaining, and operating garbage and
> waste disposal and collection facilities and garbage and waste
> disposal and collection equipment, in and for the parish . . . to the
> extend and in the manner provided by Sub-Part F, Part III, Chapter
> 4, Title 39 of the Louisiana Revised Statues of 1950, as amended,
> and other constitutional and statutory authority.

R. 46-1 at 10.  As noted *supra*, the above-referenced statute was repealed effective January 1,

2016.  La. R. S. 39:1503.

## C.  Analysis

### i.  PWS's 2013 Contract

PWS's 2013 contract provides for a seven-year extension of its contract for service with

St. Bernard Parish.  Section 5-06 of St. Bernard's Charter provides that "[c]ontracts for services

not covered by the public bid law shall not be for a period exceeding three (3) years."  PWS does

not argue that the 2013 contract is subject to the public bid law.  Therefore, if Section 5-06 of St.

Bernard's Charter is applicable to the instant contract and its three-year cap is interpreted by its

plain meaning, St. Bernard lacked the power to enter the 2013 contract.

PWS argues that the three-year limit on contracts for services not covered by public bid

law only applies to capital improvements.  The language enacting the three-year cap is

immediately preceded by the following language: "Nothing in this Charter shall be construed so

as to prevent the making or authorizing of payments or making of contracts for capital improvements to be financed wholly or partly by the issuance of bonds or to prevent the making of any contract or lease, provided that such action is authorized by ordinance." R. 57-9 at 32. With this in mind, PWS argues that the subsection applies solely to contracts for capital improvements, and that the three-year cap for contracts for services therefore excludes service contracts unrelated to capital improvements. PWS's contract would then fall outside the scope of Section 5-06.

PWS's argument is unavailing. The language, "Contracts for services not covered by the public bid law shall not be for a period exceeding three (3) years," is unambiguous. R. 57-9 at 32. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code art. 9. The language at issue, "contracts for services," is unambiguous, and the provision regarding contracts for services is not in tension with the "contracts for capital improvements" provision such that it leads to an absurd consequence. R. 57-9 at 32. Even if the Louisiana Civil Code were not on point, the Court cannot search for legislative intent when the legislature has expressed itself in an unambiguous manner. The Supreme Court has held "time and time again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461–62 (2002) (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

The Court finds that following Louisiana's canons of statutory interpretation would lead to the same outcome.[1]  Per the instruction of Louisiana's Civil Code, "[w]hen the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law."  La. Civ. Code art. 10.  The purpose of Section 5-06 of St. Bernard's Charter is to govern the "Administration of Operating and Capital Budgets."  R. 57-9 at 32.  Therefore both operating administration and capital budget administration are addressed in this section.  A contract for services is an administration of operation matter.  When filing its motion for preliminary injunction, PWS argued that "Louisiana recognizes public contracts for non-professional services are particularly susceptible to fraud and abuse and public bidding laws protect the interests of tax-paying citizens by encouraging open competitive bidding for those services."  R. 2-1 at 15–16.  The three-year cap on contracts for services not covered by the public bid law represents a corollary public policy judgment: contracts not subject to public bid law should be periodically revisited in order to reduce the risk of fraud or abuse.  If the phrase "contracts for services" was ambiguous, arbitrarily limiting the three-year cap to contracts for capital improvements would frustrate the purpose of the provision.  PWS's interpretation cannot stand.  R. 57-9 at 32.

PWS argues in the alternative that Section 5-06 is amended by Louisiana Revised Statute 33:4169.1(A)(3), which provides that "The governing authority of every parish or municipality

---

[1] The result is no different under the federal canons.  The most basic "canon of contractual interpretation [instructs] . . . that words and phrases in a contract [are] to be given their plain meanings, unless the document demonstrates that the parties intended for the terms to be employed in some special or technical sense."  *Cleere Drilling Co. v. Dominion Expl. & Prod., Inc.*, 351 F.3d 642, 650–51 (5th Cir. 2003).  Limiting "contracts for services" to "contracts for capital improvements" would be contrary to the plain meaning of contracts for services, because "contracts for services" are not plainly limited to capital improvements.  Second, Subsection b of Section 5-06 includes two sentences—one which discusses contracts for capital improvements, and another which discusses contracts for services.  R. 57-9 at 32.  When the legislature uses different terms in a statute, "courts interpreting the [statute] presume that the use of different terms signifies a different meaning."  *See Serv. Steel Warehouse Co., L.P. v. McDonnel Group, LLC*, No. 14-1416, 2016 WL 128152, at *5 (E.D. La. Jan. 11, 2016) (citing Jacob Scott, *Codified Canons and the Common Law of Interpretation*, 98 Geo. L.J. 341, 368 (2010).  If the enactors of the Charter intended to restrict the three-year limit to contracts for capital improvements, they would not have varied

shall have the following powers: . . . [t]o enter into time contracts for the collection and transportation of garbage or trash for a term of up to ten years, and for disposal of garbage or trash for a term of up to twenty-five years." This argument fails. First, Section 5-06 of the St. Bernard Charter is not in conflict with Louisiana Revised Statute 33:4169.1(A)(3). The St. Bernard Charter imposes a compulsory limitation on the power of St. Bernard Parish, and Louisiana Revised Statute 33:4169.1(A)(3) permits the governing authority of a municipality to go beyond these bounds. Section 1-04 of the St. Bernard Charter disavows "all of the powers, rights, privileges, immunities, and authorities heretofore possessed by St. Bernard Parish under the constitution, statutes, and laws of the state of Louisiana" that are disclaimed by the terms of the Charter. R. 57-9 at 5. Section 5-06 restricts the scope of St. Bernard's capacity to enter into contracts for services not covered by the public bid law. R. 57-9 at 32. Therefore, St. Bernard has validly renounced the permissive grant of power codified in Louisiana Revised Statute 33:4169.1(A)(3).

PWS's cited case law is inapposite. PWS cites *Town of Homer v. Entergy La., Inc.*, 48,924 (La. App. 2 Cir. 4/9/14), 137 So. 3d 811, 814–15, for the proposition that Article VI section 2 of the Louisiana constitution provides that a parish charter may be amended by the enactment of a "local law" by the legislature. Even if Louisiana Revised Statute 33:4169.1(A)(3) were a local law, the Louisiana constitution only provides that local laws may amend "a special legislative charter existing on the effective date of [the Louisiana] constitution." La. Const. Ann. Art. VI § 2 (2016). The present Louisiana constitution was enacted in 1974. St. Bernard's Charter was passed by the voters on November 8, 1988. R. 57-9 at 2. Therefore, the Louisiana Constitution provides no basis for Louisiana's permissive grant of authority to enter into ten-year

---

their language in the next sentence of the sub-section. Third, Subsection (a) and Subsection (c) refer to both operating and capital improvements. Therefore, Subsection (b) may also refer to both categories of improvements.

contracts for waste removal services to supersede the St. Bernard Charter's three-year limit on such contracts.

PWS lastly argues that St. Bernard "opted in" to Louisiana Revised Statute 39:1503(A)(1) when it enacted ordinance 13-49. Louisiana Revised Statute 39:1503(A)(1) provides that "consulting service contracts" shall provide, among other things, "adequate public notice of the request for proposals . . . . and written notice . . . to persons, firms, or corporations who are known to be in a position to furnish such services at least thirty days before the last day that proposals will be accepted." In turn, ordinance 13-49 authorized a tax to support garbage and waste disposal activities, and further provided that the tax would be spent in compliance with the provisions of Louisiana Revised Statute 39:1503(A)(1). Turning to the text of St. Bernard's Charter, the Charter may be amended by local ordinance, but only following "an affirmative two-thirds (2/3) vote of the total council membership and approval by the electorate." R. 57-9 at 12–13. There is no evidence in the record to indicate that ordinance 13-49 functioned as an amendment to the St. Bernard Charter. So even if ordinance 13-49 attempted to opt in to the bidding procedures of Louisiana Revised Statute 39:1503(A)(1), it could only do so to the extent that the Louisiana statute did not conflict with the provisions of the St. Bernard Charter. Therefore, ordinance 13-49 did not supplant the Charter's three-year limit on contracts for services not covered by public bid law.

In sum, Section 5-06 of the St. Bernard Charter places a three-year limit on contracts such as PWS's 2013 contract with St. Bernard. No state law or local ordinance nullifies the effect of Section 5-06. Therefore, St. Bernard lacked the capacity to enter into a contract for waste removal services in excess of three years with PWS, and the contract is void as a matter of law insofar as the contract purported to exceed a three-year term.

ii.      Pelican's 2016 Contract

PWS contests the validity of Pelican's 2016 contract.  In order to determine whether

Pelican's contract is invalid, the Court must first determine whether PWS has standing to contest

the validity of Pelican's contract.  Only then may the Court evaluate whether St. Bernard's

actions were outside of the authority granted by Louisiana law and the St. Bernard Charter.

1.      Standing

To establish standing, PWS must have suffered an "injury in fact—an invasion of a

legally protected interest" that is "concrete and particularized" and "actual or imminent not

conjectural or hypothetical."  *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 387 (5th

Cir. 2003) (internal quotations omitted).  PWS must also show "a causal connection between his

injury and defendants' conduct, and likely probability his injury will be redressed by a favorable

decision."  *Id.* (internal quotations omitted).  Generally speaking, only a party to a contract or a

third party beneficiary to a contract has standing to bring suit regarding the breach of a contract.

*See Smiley v. Oxford Capital, LLC*, 100 F. App's 970, 973 (5th Cir. 2004); *Cottingham v.

General Motors Corp.*, 119 F.3d 373, 380 (5th Cir. 1997); *BCR Safeguard Holding, L.L.C. v.

Morgan Stanley Real Estate Advisor, Inc.*, No. 13-0066, 2014 WL 4354457, at *36 (E.D. La.

Sept. 2, 2014), *affirmed*, 614 Fed. Appx. 690 (5 th Cir. 2015).  Standing to sue in diversity cases

is determined by the substantive rights available under state law.  *United States v. 936.71 Acres

of Land, More or Less, in Brevard Cty., State of Fla.*, 418 F.2d 551, 556 (5th Cir. 1969) (internal

citations omitted).

Louisiana law provides that "a taxpayer may resort to judicial authority to restrain from

transcending their lawful powers or violating their legal duties in any unauthorized mode which

would increase the burden of taxation or otherwise unjustly affect the taxpayer or his property."

*All. For Affordable Energy v. Council of City of New Orleans*, 96-0700 (La. 7/2/96), 677 So. 2d

424, 428 (citing *Stewart v. Stanley*, 5 So. 2d 531, 535 (1941)).  In particular, the Court finds that this case is controlled by its holding in *Jefferson Par. Consol. Garbage Dist. No. 1 v. Waste Mgmt. of La., L.L.C.*, No. 09-6270, 2011 WL 4852918, at *2 n.2 (E.D. La. Oct. 13, 2011), where this Court held that a waste services provider had standing to bring an action as a Louisiana taxpayer against a municipality where the municipality allegedly awarded a public services contract to a competitor in violation of the laws of Louisiana or a Louisiana municipality.  The present case is factually indistinguishable.  Therefore, the substantive rights of Louisiana provide PWS standing to challenge the validity of Progressive's contract despite the invalidity of its own contract.

### 2.      Validity of the Contract

St. Bernard's contract with Pelican is void as an *ultra vires* act if the Pelican contract was established contrary to Louisiana law or the St. Bernard Charter.  The Pelican contract was negotiated and issued by St. Bernard's parish president, Mr. McInnis, the Executive Director of Coastal Operations, Mr. Lane, and the parish's chief administrative officer, Mr. Alonzo.  *See* R. 81-3 at 22; 81-4 at 32.  If these individuals failed to follow procedures mandated by state or parish law, the contract is invalid.

The following provisions of the St. Bernard Charter enumerate powers over the procurement of services or waste management generally.  Section 5-10 of the St. Bernard Charter provides as follows: "Purchasing of all property, supplies, material, and services shall be under a central purchasing system and shall be in accordance with applicable state law, council policy, and administrative requirements."  R. 57-9 at 33.  Section 4-04 vests the power to procure services required by the parish government in St. Bernard's director of finance, R. 57-9 at 21–22, and a general power over "[g]arbage and trash collection and disposal" in St. Bernard's director of public works.  R. 57-9 at 22–23.

21

The Charter also provides the chief administrative officer and parish president with some authority over contracts.  The parish's chief administrative officer is charged with "[m]anaging contracts and monitoring . . . all parish contracts."  R. 57-9 at 20.  The parish president is vested with "general executive and administrative authority over all departments . . . of the parish government except as otherwise provided by the Charter."  R. 57-9 at 16.  The parish president's enumerated powers include "insur[ing] [sic] that all laws, provisions of the charter, and acts of the council . . . are faithfully executed," and "[d]irect[ing] and supervis[ing] the administration of all departments, offices, and agencies of the parish government, except as otherwise provided by this Charter."  R. 57-9 at 17.

The testimony of Mr. McInnis and Mr. Lane indicates that the Request for Proposals procedure that led to the Pelican contract was conducted through informal channels in Mr. McInnis's department.  Mr. McInnis asked John Lane, the Director of Coastal Operations, "to make phone calls and handle this process . . . ."  R. 81-4 at 32.  Mr. McInnis testified "that [he] [had] a great deal of trust in Mr. Lane," but that Mr. McInnis also wanted "our [chief administrative officer] to be involved . . . ."  R. 81-4 at 32.  Mr. Alonzo, chief administrative officer of St. Bernard, testified that he was a part of the Request for Proposals process, but that the contract "was basically put together initially by Mr. John Lane who . . . we asked . . . to kind of work together on this."  R. 81-3 at 22.

Mr. Lane followed the instruction of Mr. McInnis, and contacted three garbage collection service companies that had expressed an interest in providing waste removal services to St. Bernard.  R. 81-4 at 33.  Mr. McInnis knew of Pelican's interest from an "offhand" encounter in Shreveport with a Pelican representative.  R. 81-4 at 33.  Mr. McInnis learned of Ramelli, another waste services provider, when a representative of Ramelli called and asked for an opportunity to provide garbage collection services.  R. 81-4 at 33.  Mr. McInnis's final lead

22

stemmed from a meeting that a council member had with an employee of Waste Pro while the council member "was shooting pool somewhere."  R. 81-4 at 33.  Ms. Doskey, the executive assistant/office manager to the Department of Public Works, testified that this informal method of procuring a service contract is rare in St. Bernard.  At deposition, Ms. Doskey only identified two contracts for services that were not obtained by the Department of Public Works—the Pelican contract, and a grass cutting project.  R. 76-1 at 11.  Keith LaGrange, the director of the Public Works Department, also confirmed that the Request for Proposals regarding the Pelican contract was not issued through the Public Works Department.  Rather, the informal non-advertised Request for Proposals was issued through Administration, i.e., the office of the parish president.  R. 92-1 at 3.

The Record indicates that neither the director of public works nor the director of finance were involved with determining who received a Request for Proposals, the content of the Request for Proposals, or the review of the responses to the Request for Proposals.  If the Charter requires that a contract for services be processed by either of these two directors or their respective departments, the Pelican contract fails as an act outside the scope of the parish president's authority.  Upon review of the Charter, the Court finds that the parish president lacks the power to bypass both the director of public works and the director of finance's respective authority over waste removal operations and the procurement of contracts.  The parish president's two most pertinent powers are (1) to ensure the laws of St. Bernard are faithfully executed and (2) to direct and supervise the administration of parish departments and agencies.[2] R. 57-9.  St. Bernard has cited no law which the parish president sought to enforce by internally issuing a Request for Proposals.  And the parish president did not direct or supervise a parish

_____

[2] The parish president's power to staff an office which handles "business contacts and inquiries," R. 57-9 at 17, may have supported Mr. McInnis's initial instruction to Mr. Lane to "make phone calls," R. 81-4 at 32, but this authority cannot be extended to override the explicit designations of procurement power and waste services

department—he instead ignored the departments tasked with overseeing waste removal and the procurement of services.  Furthermore, while the parish president did include the parish's chief administrative officer in the Request for Proposals procedure, a plain reading of the chief administrative officer's power over "managing contracts and monitoring . . . contracts" does not extend to the procurement of contracts itself.  R. 57-9 at 20.

At oral argument, counsel for St. Bernard pointed out the difficulties faced by St. Bernard Parish in the wake of Hurricane Katrina regarding long term projects such as streamlining waste services.  Mr. McInnis's informal investigation of alternative waste services providers was clearly an attempt to expeditiously alleviate budgetary concerns and address perceived shortcomings with the performance of PWS.  As summarized by Mr. McInnis at deposition, St. Bernard was experiencing a "budget crunch."  However, Mr. McInnis's laudable motives cannot supersede the division of powers meted out by the St. Bernard Charter.  Under the Charter, the director of finance is charged with the procurement of services, and the director of public works is charged with overseeing "garbage and trash collection and disposal."  R. 57-9 at 22–23.  Mr. McInnis may supervise departmental actions, or terminate department directors at will.  R. 57-9 at 19.  But he may not usurp authority lawfully delegated to departmental officials.  The Pelican contract is therefore null.

## IV.  DISCUSSION OF THE MOTION TO DISMISS

PWS brings a Motion to Dismiss for Failure to State a Claim in Counterclaim, asserting that St. Bernard's pre-2013 claims are barred as *res judicata*.  R. 63.

### A.  Applicable Law

Dismissal under Rule 12(b)(6) on *res judicata* grounds may be appropriate if "the elements of *res judicata* are apparent on the face of the pleadings."  *Dean v. Miss. Bd. of Bar*

---

responsibility to the Department of Finance and the Department of Public Works respectively.

*Admissions*, 394 F. App'x 172,175 (5th Cir. 2010) (citing *Kansa Reinsurance Co., Ltd. v. Cong.*

*Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994)).  *Res judicata* ensures the finality of a

judgment. *Brown v. Felsen,* 442 U.S. 127, 131 (1979).  In essence, under *res judicata,* "a final

judgment on the merits of an action precludes the parties or their privies from relitigating issues

that were or could have been raised in that [prior] action."  *Allen v. McCurry,* 449 U.S. 90, 94

(1980) (citation omitted). Moreover, *res judicata* protects "[a]gainst 'the expense and vexation

attending multiple lawsuits, conserv[es] judicial resources, and foste[rs] reliance on judicial

action by minimizing the possibility of inconsistent decisions.'"  *Taylor v. Sturgell,* 553 U.S.

880, 892 (2008) (quoting *Montana v. United States,* 440 U.S. 147, 153–54 (1979)).

      Claim preclusion and issue preclusion compose the doctrine of *res judicata*.  *Id.*  The

federal common law of claim preclusion

> bars the litigation of claims that either have been litigated or
> should have been raised in an earlier suit.  The test
> for claim preclusion has four elements: (1) the parties in the
> subsequent action are identical to, or in privity with, the parties in
> the prior action; (2) the judgment in the prior case was rendered by
> a court of competent jurisdiction; (3) there has been a final
> judgment on the merits; and (4) the same claim or cause of action
> is involved in both suits. . . .   When all four elements are
> present, claim preclusion prohibits a litigant from asserting any
> claim or defense in the later action that was or could have been
> raised in support of or in opposition to the cause of action asserted
> in the prior action.

*Duffie v. United States,* 600 F.3d 362, 372 (5th Cir.), *cert. denied*, 131 S. Ct. 355,

(2010) (quotation and citations omitted).  When analyzing the fourth element of federal claim

preclusion, the court applies

> the transactional test to determine if two suits involve the same
> cause of action.  Under the transactional test, a prior judgment's
> preclusive effect extends to all rights of the plaintiff with respect to
> all or any part of the transaction, or series of connected
> transactions, out of which the original action arose. . . .   [I]t is
> immaterial that some of the legal theories [the plaintiff] relies on

differ from those in [the prior] complaint. The critical issue is whether the two actions are based on the same 'nucleus of operative facts.'

*Cuauhtli v. Chase Home Fin. LLC,* 308 F. App'x 772, 774 (5th Cir. 2009) (internal quotations omitted).

In Louisiana, the doctrine of *res judicata* is established by statute, which provides that "a valid and final judgment is conclusive between the same parties" in the following circumstances: "If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action." La. Rev. Stat. § 13:4231(2). Thus, the statute "precludes re-litigation of claims and issues arising out of the same factual circumstances when there is a valid final judgment." *Myers v. Nat'l Union Fire Ins. Co. of La.*, No. 2009-1517 (La. App. 4 Cir. 5/19/10), 43 So. 3d 207, 210, *writ denied*, 2010-2049 (La. 11/12/10), 49 So. 3d 892 (citing *Ave. Plaza, L.L.C. v. Falgoust,* 676 So.2d 1077, 1079 (La .1996)).

Therefore, under Louisiana law, a counterclaim defendant must establish that

> (1) the [prior state court] judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation.

*Myers,* 43 So.3d at 211 (quoting *Burguieres v. Pollingue,* 843 So.2d 1049, 1053 (La. 2003)).

"[T]he chief inquiry is whether the second action asserts a cause of action which arises out of the same transaction or occurrence that was the subject matter of the first action.'" *Burguieres,* 843 So.2d at 1053. The Louisiana *res judicata* statute "is modeled on federal preclusion doctrine and the Restatement of Judgments, [so that] federal jurisprudence may be consulted when the

26

relevant Louisiana cases leave doubt as to the meaning of the statute." *Sevin v. Parish of Jefferson,* 632 F.Supp.2d 586, 594 (E. D. La. 2008) (citing *In re Keaty,* 397 F.3d 264, 271 (5th Cir. 2005)).

### B.   ANALYSIS

The Court finds that PWS has shown that the Louisiana state court validly disposed of the 2013 suit between St. Bernard and PWS.  St. Bernard concedes that the parties are identical and that the 2013 case was dismissed with prejudice.  R. 82 at 12–13.  St. Bernard fails to argue that the claims brought in the instant action were unavailable at the time of the preceding suit.  As such, all causes of action in the instant litigation stemming from the same transaction or occurrence as the 2013 case are barred as claim precluded.  *See Myers,* 43 So.3d at 211. PWS describes the 2013 lawsuit as a breach of contract action stemming from St. Bernard's allegedly wrongful "attempt[] to solicit proposals for services provided by PWS before the expiration of the term of the [second SDT contract] (including options)."  R. 63-1 at 9.  PWS's asserted cause of action in the 2013 lawsuit primarily sounds in the law of contractual and statutory interpretation.  Pragmatically evaluating PWS's characterization of the 2013 dispute, PWS's asserted cause of action arose from the same transaction or occurrence as St. Bernard's current prayer for a declaratory judgment finding the second SDT contract invalid.  Challenging the validity of the SDT contract was a logical defense to PWS's 2013 claim based on the purported exclusivity of the SDT contract.  The compulsory nature of the aforementioned counterclaim is especially compelling on these facts, because St. Bernard claims that the purported exclusivity giving rise to PWS's 2013 lawsuit is a double-edged sword that invalidates the contract itself.  PWS's asserted damages stemming from wrongful payments under the second SDT contract are therefore claim precluded.

In contrast, St. Bernard's counterclaims for breach of contract raise multiple questions of fact that lie outside of the four corners of the contract.  The purported exclusivity of the contract is a purely legal question, and factually irrelevant to whether PWS inappropriately overbilled St. Bernard by not following an agreed-upon house count or by improperly charging for non-residential waste.  As such, these two counterclaims are not claim precluded.

## V.   DISCUSSION OF THE COUNTERCLAIM SUMMARY JUDGMENT MOTIONS

PWS brings a Motion for Summary Judgment on Counterclaims asserting that St. Bernard fails to raise a question of material fact as to each of its asserted counterclaims.  R. 65.

### A.   Applicable Law

As explained *supra*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  *Id.*  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.  *Id.* at 323.  If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact.  *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are

insufficient to defeat a motion for summary judgment.  *See Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *see also Anderson*, 477 U.S. at 249–50.  In ruling on a summary judgment motion, however, a court may not resolve credibility issues or weigh evidence. *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).  Furthermore, a court must assess the evidence, review the facts and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment.  *See Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

### B.    Analysis

St. Bernard asserts five counterclaims: (1) breach of contract for overbilling for the quantity of services performed between August 1, 2006, and December 31, 2012; (2) breach of contract for overbilling in pricing for services performed between January 20, 2014 and December 31, 2014; (3) breach of the 2013 PWS contract for failure to perform; (4) declaratory relief that the first SDT contract, the second SDT contract, and the PWS contract were awarded in violation of Louisiana's public bid law; and (5) declaratory relief that the second SDT contract and the 2013 PWS contract were improperly awarded under Section 5-06 of the St. Bernard Charter.  Counterclaims seeking judgment on the validity of the second SDT contract are barred by *res judicata*, as explained *supra*.  Counterclaims seeking declaratory relief concerning the validity of the PWS contract are moot, as this Court finds the PWS contract invalid per Section 5-06 of the St. Bernard Charter.  Upon review of the Record, the Court finds that all of St. Bernard's remaining counterclaims for breach of contract raise questions of material fact.

For example, PWS contends that the former parish president agreed to a waste services rate increase linked to the Consumer Price Index.  St. Bernard argues in opposition that a question of material fact is created by the deposition testimony of the former parish president,

who states that no increase was agreed to in writing.  R. 82 at 35.  St. Bernard asserts that a rate

increase could only be approved in writing pursuant to the PWS contract.[3]  R. 82 at 35.  As such,

a reasonable jury could find for PWS.

Similarly, St. Bernard's counterclaim regarding overbilling for the quantity of services

performed raises factual questions.  PWS contended at oral argument that PWS performed more

services because residential customers were disposing of more trash as they demolished or

restored homes in the wake of Hurricane Katrina.  R. 65-1 at 12–14.  St. Bernard in turn presents

evidence of a spike in the tonnage of waste billed, and argues that the sharp increase in waste

tonnage does not match the residential water meter count.  R. 82 at 34.  St. Bernard also averred

at oral argument that waste services associated with home rebuilding should have been billed to

the federal government.  The preceding evidence raises a question of material fact.

St. Bernard also meets its Rule 56 burden as to the breach of contract for failure to

perform.  PWS avers that less than a hundred customer complaints were filed regarding PWS's

performance, and argues that St. Bernard therefore cannot assert a material breach of the

contract.  R. 65-1 at 17–18.  St. Bernard responds with numerous affidavits suggesting that St.

Bernard was rightfully concerned about the quality of PWS's service, and that PWS may have

been dumping non-residential and/or non-St. Bernard waste in an effort to overbill St. Bernard.

R. 82 at 35–36.  The veracity of these claims is a question of fact suitable for trial.  Summary

judgment is inappropriate.

## VI.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Pelican's Motion for Summary

Judgment Finding Plaintiff's Contract Invalid, R. 38, is hereby **GRANTED**.

---

[3] PWS does not seek summary judgment on the legal question of whether the parish president had the
authority to increase PWS's rate despite the requirement in the contract that all rate increases be approved in writing.
Or, at the very least, PWS failed to brief the issue.  Instead, PWS asserts that St. Bernard fails to present sufficient

**IT IS FURTHER ORDERED** that Pelican's Motion for Summary Judgment on the Validity of Pelican's Contract and the Right of St. Bernard Parish Government to Pay It, R. 39, is hereby **DENIED** since the Pelican contract is invalid.

**IT IS FURTHER ORDERED** that PWS's Motion for Summary Judgment on 2013 Time Contract, R. 46, is hereby **DENIED**.

**IT IS FURTHER ORDERED** that PWS's Motion for Summary Judgment on Intervenor's Contract, R. 48, is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that St. Bernard's Motion for Summary Judgment as to the Invalidity of the PWS Contract, R. 57, is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that St. Bernard's Motion for Summary Judgment as to the Invalidity of the Pelican Contract, r. 54, is hereby **DENIED**.

**IT IS FURTHER ORDERED** that PWS's Motion to Dismiss for Failure to State a Claim in Counterclaim, R. 63, is hereby **GRANTED IN PART**.  The motion is **GRANTED** insofar as PWS seeks to dismiss St. Bernard's prayers for relief stemming from the invalidity of the second SDT contract.

**IT IS FURTHER ORDERED** that PWS's Motion for Summary Judgment on Counterclaim, R. 65, is hereby **DENIED**.

**IT IS FURTHER ORDERED** that PWS's Motion to Strike Certain of Defendant's Witnesses, R. 61, is **DENIED**, reserving PWS the right to re-urge if necessary.  The Court has continued the case, so PWS's principal objections are moot.

New Orleans, Louisiana, this 9th day of August, 2016.

UNITED STATES DISTRICT JUDGE

---

evidence to satisfy its burden under Rule 56.